UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SONIA TALAVERA, as Administrator of the    Docket No.:
Estate of HERMAN TITO DIAZ,

                        **COMPLAINT**

               Plaintiff,

      -against-                 Plaintiff Demands Trial by Jury

CITY OF NEW YORK, NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION,
JOHN DOE 1, JOHN DOE 1, JOHN DOE 3,
JOHN DOE 4, and JOHN DOE 5,

                Defendants.
----------------------------------------------------------X

      Plaintiff SONIA TALAVERA, as Administrator of the Estate of HERMAN TITO DIAZ,

by her attorneys, KELNER & KELNER, ESQS., as and for her Complaint in the above-

captioned action, hereby alleges as follows upon information and belief:

**Preliminary Statement**

      1.     This action arises from the death of Herman Tito Diaz, a detainee at Rikers Island,

while in custody of the City of New York.  Rikers Island long has been allowed to persist in a

state of dysfunction and neglect, in which inmates and detainees are routinely subjected to

intolerable risks to their health and safety.  In recent years, it has been allowed to deteriorate

even further.  In 2021 and early 2022, a total of at least 19 men died while in the City's custody

there.  One of them was Herman Tito Diaz, a pretrial detainee.  While in his housing area, he

suffered a medical event.  He was left without adequate supervision, including, but not limited

to, in that there was no corrections officer assigned to the floor of his housing block.  He did not

receive timely access to medical care, resulting in other inmates having to carry him to a clinic

for help while officers looked on.  Left helpless and denied care until it was too late, he died. This lawsuit seeks to hold defendants accountable for his preventable death.

## Jurisdiction and Venue

2.      This action arises from violations of plaintiff's civil and constitutional rights by the CITY OF NEW YORK, its agents, servants, and/or employees, including, but not limited to JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and from these defendants' negligent acts and/or omissions; and from violations of plaintiff's civil and constitutional rights and medical malpractice and negligence by the NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, its agents, servants, and/or employees, including, but not limited to, JOHN DOE 4 and JOHN DOE 5.

3.      This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This action arises, *inter alia*, under 42 U.S.C. § 1983 and § 1988, and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.      This Court has supplemental jurisdiction over plaintiff's claims arising under state law, including, but not limited to, for general negligence and medical malpractice, because they are so related to the federal claims that they form part of the same case and/or controversy.

5.      A substantial part of the events and/or omissions giving rise to the claims herein occurred in the County of Bronx, State of New York, and venue in the United States District Court for the Southern District of New York is therefore proper.

## Parties

6.      On or about March 18, 2022, decedent HERMAN TITO DIAZ died, leaving distributees surviving.

7.     On April 19, 2022, SONIA TALAVERA was appointed Administrator of the Estate of Herman Tito Diaz by Order of the Honorable Rita Mella of the Surrogate's Court, New York County, and is presently acting in said capacity.

8.     At all times herein mentioned, defendant CITY OF NEW YORK was and remains a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

9.     At all times herein mentioned, the New York City Department of Correction was and remains an agency, subdivision, and/or instrumentality of the CITY OF NEW YORK.

10.     At all times herein mentioned, defendant NEW YORK CITY HEALTH AND HOSPITALS CORPORATION (hereinafter "NYCH+H") was and remains a public benefit corporation, duly organized and existing under and by virtue of the laws of the State of New York.

11.     At all times herein mentioned, defendant JOHN DOE 1, a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

12.     At all times herein mentioned, defendant JOHN DOE 2, a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

13.     At all times herein mentioned, defendant JOHN DOE 3, a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

14.     At all times herein mentioned, defendant JOHN DOE 4, a fictitious name, his or her real name being unknown, was employed by defendant NYCH+H.

15.     At all times herein mentioned, defendant JOHN DOE 5, a fictitious name, his or her real name being unknown, was employed by defendant NYCH+H.

16.      Plaintiff undertook reasonably diligent efforts to identify officers JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5, but said information is presently within the sole and exclusive custody of the defendants herein.

**As and For a First Cause of Action for Negligence against defendants CITY OF NEW YORK and NYCH+H**

17.      On May 11, 2022, plaintiff SONIA TALAVERA, as Administrator of the Estate of Herman Tito Diaz, duly and timely served a Notice of Claim, in writing, upon defendant CITY OF NEW YORK.

18.      On May 11, 2022, plaintiff SONIA TALAVERA, as Administrator of the Estate of Herman Tito Diaz, duly and timely served a Notice of Claim, in writing, upon defendant NYCH+H.

20.      On June 14, 2022, plaintiff SONIA TALAVERA, as Administrator of the Estate of Herman Tito Diaz, appeared for a hearing pursuant to General Municipal Law §50-h noticed by the CITY OF NEW YORK.

21.      NYCH+H did not demand a hearing pursuant to General Municipal Law §50-h, and the time allotted to it by law to have done so has now lapsed; it has therefore waived any such hearing.

22.      More than thirty days have elapsed since the service of said Notice of Claim upon defendant CITY OF NEW YORK and it and/or its Comptroller has failed, neglected and refused to pay, settle, compromise or adjust the claims of the plaintiff herein.

23.      More than thirty days have elapsed since the service of said Notice of Claim upon defendant NYCH+H and it and/or its Comptroller has failed, neglected and refused to pay, settle, compromise or adjust the claims of the plaintiff herein.

24.     The instant action has been brought within one year and ninety days from when the claims set forth herein accrued, and all causes of action set forth herein, including for negligence against defendant CITY OF NEW YORK, are timely.

25.     At all times herein mentioned, defendant JOHN DOE 1 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

26.     At all times herein mentioned, defendant JOHN DOE 2 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

27.     At all times herein mentioned, defendant JOHN DOE 3 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

28.     At all times herein mentioned, defendant JOHN DOE 4 was acting within the scope of his/her employment with defendant NYCH+H.

29.     At all times herein mentioned, defendant JOHN DOE 5 was acting within the scope of his/her employment with defendant NYCH+H.

30.     At all times herein mentioned, defendant JOHN DOE 1 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

31.     At all times herein mentioned, defendant JOHN DOE 2 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

32.     At all times herein mentioned, defendant JOHN DOE 3 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

33.     At all times herein mentioned, defendant JOHN DOE 4 was acting under color of law, on behalf of the defendant NYCH+H, and with the power and authority vested in him/her as a consequence thereof.

34.     At all times herein mentioned, defendant JOHN DOE 5 was acting under color of law, on behalf of the defendant NYCH+H, and with the power and authority vested in him/her as a consequence thereof.

35.     At all times herein mentioned, defendant CITY OF NEW YORK, its agents, servants, and/or employees, owed decedent a common law duty of care, including, but not limited to, affording him reasonable supervision and protection, and access to medical care.

36.     On and prior to March 18, 2022, Herman Tito Diaz was being detained at the Rikers Island Correctional Facility, in the County of Bronx, State of New York, and was within the care, custody, and control of defendant CITY OF NEW YORK, by and through its Department of Correction.

37.     The CITY OF NEW YORK owned, operated, managed, maintained, and controlled the Rikers Island Correctional Facility.

38.     At all times herein mentioned, defendant NYCH+H was responsible for the provision of medical care to detainees and/or inmates at the Rikers Island Correctional Facility, and employed the medical personnel responsible for same.

39.     Defendant NYCH+H had a duty to render medical care to detainees and/or inmates at Rikers Island in accordance with good and accepted standards of medical practice, and otherwise to exercise reasonable care in the discharge of its functions.

40.    On and prior to March 18, 2022, Herman Tito Diaz was being detained at the Rikers Island Correctional Facility, within the Eric M. Taylor Center (EMTC), in a general population dormitory unit.

41.    A general population dormitory unit like the one in which decedent was housed was intended to be staffed by a floor ("B" officer), whose responsibilities would include supervision of the housing floor and the provision of aid to inmates when necessary or appropriate.

42.    A dormitory unit also was intended be staffed by an "A" officer, who could enter housing area when necessary to provide supervision, security, assistance, and/or care to the inmates and/or detainees therein.

43.    On March 18, 2022, and for a period of time prior thereto, there was no "B" officer assigned to decedent's housing area, leaving the detainees and inmates therein without immediate and proximate supervision and care.

44.    On March 18, 2022, defendant JOHN DOE 1 was the "A" officer assigned to decedent's housing area in EMTC.

45.    On March 18, 2022, while in his housing unit, Herman Tito Diaz suffered a medical event.

46.    At the time he suffered the medical event, there was no floor officer and no other officer immediately present who was situated to render immediate first aid treatment.

47.    Decedent's housing unit was not staffed in accordance with defendant's rules, practices, and/or guidelines for the supervision and protection of inmates and detainees.

48.    After decedent began to suffer from a medical event, JOHN DOE 1 did not enter the unit to provide assistance.

49.     After he began to suffer from a medical event, JOHN DOE 1 did not timely obtain emergency medical assistance.

50.     Decedent was not afforded timely access to medical care, including, but not limited to, due to the lack of supervision from correctional personnel who could have obtained it for him, including, but not limited to, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5.

51.     The delay in the provision of medical assistance was caused, in whole or in part, by defendant CITY OF NEW YORK's failure to provide adequate supervision of decedent's housing unit.

52.     NYCH+H failed to provide timely emergency medical assistance to Herman Tito Diaz following commencement of his medical event, notwithstanding notice of his need for care.

53.     As a result of defendants' failure to provide care or first aid to decedent, other inmates and/or detainees were required to carry him out of the housing unit in search of medical care.

54.     While he was being carried for medical care, officers in the vicinity failed to render care and/or assistance to him.

55.     Defendant CITY OF NEW YORK, its agents, servants, and/or employees unreasonably delayed decedent's access to medical care.

56.     Defendant NYCH+H, its agents, servants, and/or employees unreasonably delayed decedent's access to medical care.

57.     Prior to and following his arrival at a medical clinic, there was a substantial delay in the provision of treatment, including, but not limited to, by the agents, servants, and/or employees of defendant NYCH+H.

58.     Decedent ultimately lost consciousness and died.

59.     At all times herein mentioned, defendant NYCH+H represented that the physicians, nurses, nurse practitioners, physicians' assistants and other medical personnel in its employ, including, but not limited to, through its Correctional Health Services division, were competent and qualified to render medical, diagnostic, emergency room and other care and services in accordance with good and accepted standards of practice.

60.     On and upon the commencement of his detention at Rikers Island, decedent presented to physicians and/or other personnel employed and/or engaged by defendant NYCH+H while in custody.

61.     At all times herein mentioned, defendant NYCH+H, its agents, servants, and/or employees undertook and agreed to render medical care to decedent commencing upon decedent's detention at Rikers Island, and continuing through the date of his death.

62.     The medical, diagnostic and other care, treatment and services rendered by the aforesaid defendants, jointly and/or separately, their agents, servants and/or employees to decedent were performed in a negligent and careless manner, not in keeping with the standards customarily employed in the medical community at large in failing to properly examine, obtain timely consults, and otherwise render good and sufficient treatment to decedent.

63.     By reason of the foregoing, decedent was caused to sustain severe injuries, conscious pain and suffering, and fear of impending death, from the time of said occurrence up to the time of his death.

64.     Defendant CITY OF NEW YORK was careless, reckless, and negligent in the operation of the Rikers Island facility and supervision of decedent; in failing to render first aid and/or CPR to decedent; in failing to timely call for and/or provide medical treatment; in failing

to render or obtain medical care for decedent as required; in ignoring his distress and need for

care and attention; in failing to call an emergency; in failing to develop and maintain a sufficient

system for the administration of emergent medical care; in failing to assign sufficient personnel

to the supervision of decedent and/or decedent's housing block; in failing to assign a "B" officer;

in failing to provide for floor supervision of his cell block; in failing to provide for adequate

floor supervision of his cell block; in assigning an "A" officer to his cell block who was

restricted from providing the requisite care to inmates in his charge; in delaying the provision of

medical treatment; in failing to clearly define and delineate the roles of personnel responsible for

the supervision of inmates; in negligently hiring and/or retaining the involved officers; in failing

to treat his medical condition; in causing, allowing, and/or permitting gross deficiencies in the

assignment of personnel at Rikers Island; in causing, allowing, and/or permitting staffing

shortages at Rikers Island; in failing to assign personnel at Rikers Island to necessary positions,

including on an ongoing and systemic basis; in allowing chronic absenteeism by correctional

personnel; in failing to provide him with access to medical care as required; in failing to respond

to decedent's complaints; in ignoring decedent's need for medical attention; and in otherwise

causing, allowing, and/or permitting his pain and suffering and wrongful death.

65.     Defendant NYCH+H was careless, reckless and negligent and/or committed

medical malpractice in failing to monitor decedent's medical condition prior to the time of his

death; failing to respond to decedent's emergent need for medical attention; failing to provide

him with access to medical care as required; in failing to develop an adequate system for the

administration of emergent medical care; in failing to respond to an emergency; in failing to treat

his medical condition; in failing to respond to decedent's complaints; in ignoring decedent's

need for medical attention; in failing to take or refer decedent to the hospital; in delaying and/or

denying treatment; in failing to render medical care in accordance with good and accepted

standards; in failing to take account of his symptomology as reported or reasonably observable;

and in otherwise causing, allowing, and/or permitting his pain and suffering and wrongful death.

66.    Decedent's injuries were proximately caused by the negligence, medical

malpractice, and other acts and/or omissions of defendants CITY OF NEW YORK and

NYCH+H, their agents, servants, and/or employees.

67.    By reason of the foregoing, plaintiff has been damaged in the sum of TWENTY

MILLION ($20,000,000.00) DOLLARS.

## As and For a Second Cause of Action for Wrongful Death/Negligence Against the CITY OF NEW YORK and NYCH+H

68.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1

through 67 as though set forth more fully herein.

69.    As a result of the foregoing, decedent was caused to suffer wrongful death.

70.    Decedent's wrongful death was proximately caused by the carelessness,

recklessness, and/or negligence, and/or medical malpractice of the CITY OF NEW YORK and

NYCH+H, their agents, servants, and/or employees, including, but not limited to, in each and all

of the respects set forth above.

71.    By reason of the foregoing and the wrongful death of the plaintiff's decedent,

plaintiff on behalf of herself and any and all distributees of the decedent, has been damaged in

the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

## As and For a Third Cause of Action pursuant to 42 U.S.C. §1983 against defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5

72.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1

through 71 as though set forth more fully herein.

73.     At the time of the subject occurrence, defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5 ("the Individual Defendants") had responsibilities for the care and protection of inmates and detainees concerning the area of EMTC where decedent was housed and the medical clinic proximate thereto, including, but not limited to, in obtaining them access to medical care.

74.     The Individual Defendants owed a duty under the Fifth, Eighth Amendment, and/or Fourteenth Amendments to the United States Constitution, including, but not limited to the Due Process Clause thereof, to take reasonable measures to protect the safety of detainees in their custody and to provide them with prompt access to medical care.

75.     Decedent was subjected to a serious deprivation of these rights by being left without supervision and otherwise in the delay in the provision of access to medical care.

76.     The Individual Defendants' failure to supervise decedent, abandonment of decedent, and denial of his right to medical care represented violations of his civil and constitutional rights.

77.     The Individual Defendants, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto.

78.     As a result of the foregoing, decedent was caused to sustain severe, serious, and permanent personal injuries, conscious pain and suffering, and fear of impending death.

79.     By reason of the foregoing, decedent's Estate has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

80.     Plaintiff further claims punitive damages against JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5 in amounts to be assessed by a jury.

81.     Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

**As and For a Fourth Cause of Action pursuant to 42 U.S.C. §1983 against defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**

82.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 81 as though set forth more fully herein.

83.     Defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto.

84.     As a result of the foregoing, decedent was caused to suffer wrongful death.

85.     By reason of the foregoing, plaintiff has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

86.     Plaintiff further claims punitive damages against each and all of the named defendants herein, in amounts to be assessed by a jury.

87.     Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

**As and For a Fifth Cause of Action pursuant to 42 U.S.C. §1983 against defendant CITY OF NEW YORK**

88.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 87 as though set forth more fully herein.

89.     This incident was proximately caused by the CITY OF NEW YORK's deliberate indifference to the constitutional rights of detainees and/or inmates to reasonable protection from injury and harm while in custody and timely access to medical care.

90.     Rikers Island has been under the supervision of a Monitor since 2015, in accordance with the Consent Judgment entered in *Nunez v. City of New York, et al.*, 11-cv-5845 (LTS) (SDNY).

91.     On May 11, 2021, which was approximately ten months before the incident that is the subject of this action, the *Nunez* Monitor submitted his Eleventh Report concerning conditions at Rikers Island, documenting the status of the City's compliance with the Consent Judgment reached in that action.[1]  The Monitor wrote in his report that the "the pervasive level of disorder and chaos" at Rikers was "alarming."  (Monitor Eleventh Report, at 4).

92.     The Monitor observed, as he had in his prior reports, that the City's employees in supervisory capacities at Rikers Island were resistant to changing practices in ways that would protect inmate safety and security.  He wrote that the existing leaders of the facility "do not seem to be capable of dismantling the dysfunctional/abusive culture at the Facilities and replacing it with one built on dignity, respect, and problem-solving."  (Monitor Eleventh Report, at 9).  They exhibited a "lack of buy-in" to the need to reform practices, "rarely emerge as champions of an idea or new practice and often seem to be myopic…." (Monitor Eleventh Report, at 9-10).

93.     The Monitor also reported that there was widespread dysfunction and neglect in the assignment and distribution of correctional staff throughout the facility, jeopardizing the health and safety of the incarcerated population.  He wrote: "The Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them

---

[1] *See Nunez v. City of New York, et al.,* 11-cv-05485 (LTS) (JCF), Docket Entry No. 368.

responsibly, and to elevate the base level of skill of its Staff. All of this has a direct impact on the Department's ability to reduce the level of violence and ensure the safety and well-being of Staff and incarcerated individuals." (Monitor Eleventh Report, at 10).

94.     Posts in the facility necessary to the protection of inmates were routinely left unfilled or were staffed by officers working shifts so long that it undermined their ability to do the job adequately.

95.     The idea that Rikers Island could have staffing shortfalls that would prevent it from carrying out the basic missions of a jail is itself a product of the breakdown in order at the facility.  Rikers Island does not want for correctional personnel.  It has, as the Monitor wrote, "one of the richest staffing ratios among the systems with which the Monitoring Team has had experience." (Monitor Eleventh Report, at 10-11).

96.     However, an extraordinarily high number of correctional personnel were permitted to remove themselves, without consequence, from availability to work.  "As of March 27, 2021, approximately 2,040 Staff were not available to work."  (Monitor Eleventh Report, at 15).  This extraordinarily high rate of absenteeism was brought about, in substantial part, by "lackadaisical practices for verifying Staff's health and/or ability to return to work, and a lack of accountability for Staff who abuse the procedures."  (Monitor Twelfth Report[2], at 33-34).

97.     The Department of Correction, as a matter of course, permitted and ignored prolonged and serial absenteeism without consequence.

98.     Even *without* the unavailable personnel, the Department of Correction *still* has an extremely high cohort of available staff to assign to postings in the jail – and in fact, a roughly 1:1 ratio between incarcerated individuals and staff.

---

[2] *See Nunez v. City of New York, et al.,* 11-cv-05485 (LTS) (JCF), Docket Entry No. 431.

99.     However, the City deployed its staff in a manner not calculated to provide

sufficient protection and care to its incarcerated population.  This included the assignment of

inordinate numbers of personnel to administrative postings or other areas where they were either

gratuitous or not immediately necessary.  The *New York Times* reported that "on days [in 2021]

when guard posts in volatile Rikers housing units went unfilled, hundreds of other correction

officers were stationed elsewhere in less dangerous positions, including as secretaries, laundry

room supervisors and even bakers."[3]

100.    The *Times* further reported that "of the more than 8,900 sworn officers on the

department's payroll in February, about 850 were stationed at the department's Queens

headquarters, at its training academy or in other positions require little or no contact with

detainees."  And between 370 and 750 guards were assigned to daily posts at Manhattan

Detention Complex during a period in which the facility was holding, on the average, less than

one-tenth that many detainees.  On one day, 16 officers in the George R. Vierno Center at Rikers

Island were required to work consecutive shifts supervising detainees, while "the same jail had

five guards working as warden secretaries, two guards in the mailroom and one guard each in the

counsel room, storehouse and tool crib."

101.    The City's decision to leave inmates unsupervised or inadequately supervised in

housing units, where they face immediate risks to their health and safety, despite the availability

of personnel who could provide such supervision, is a manifestation of its deliberate indifference

to the rights of inmates and detainees in its charge.

---

[3] Jan Ransom and Bianca Pallaro, "Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction," *N.Y. Times*, December 31, 2021.

102.    The staffing shortages and misallocations of personnel existed for a prolonged period of time and were well known to the City of New York, which nonetheless allowed them to persist.

103.    Dr. Ross McDonald, NYCH+H's Chief Medical Officer for its Correctional Health Services division, wrote a letter to the New York City Council reporting his alarm.  He wrote: "Unfortunately, in 2021 we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of those it is charged with incarcerating in its jails…."[4]  He also noted that "[d]eath and injury are predictable consequences of repeated failures to perform certain essential functions due to the unavailability of staff."  This included "failing to provide correctional staff to supervise some housing areas or observe incarcerated people placed on suicide watch."

104.    Despite these blaring warning alarms, the Department of Correction persisted in its indifference to the health and safety of inmates in its charge.  On "any given day in October 2021, an average of approximately 80 posts went unmanned—including posts in which Staff directly supervise and facilitate services for people in custody."  *See* Monitor Twelfth Report, at 33.

105.    On March 16, 2022, the Monitor filed a "Special Report" with the Court.[5]   The Report documented that there had been no tangible progress whatsoever in addressing the deficiencies since the previous year.  (Monitor Report at 9).  The number of uniformed officers on sick leave was essentially unchanged on January 26, 2022, from what it had been on August 24, 2021.

---

[4] Accessible at https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf (last accessed June 23, 2022). All documents cited in this Complaint are respectfully incorporated herein by reference.
[5] *See Nunez v. City of New York, et al.,* 11-cv-05485 (LTS) (JCF), Docket Entry No. 438.

106.    These deficiencies fell particularly heavily on inmates and detainees in the Eric M. Taylor Center, where decedent was housed.

107.    In EMTC, at and prior to the time of the aforesaid occurrence, it was routine that housing units would not have floor officers, as was the case for decedent's unit on the date of his death, leaving them without immediate, vitally necessary protection from harm.

108.    Rikers Island's staffing and managerial neglect, the product of the City's longstanding deliberate indifference to the constitutional rights of its incarcerated population, left detainees like Herman Tito Diaz in grave danger.

109.    The City's longstanding deliberate indifference to the rights of those incarcerated at Rikers has led to numerous deaths, representing a pattern that should have placed all involved on notice of the urgent need to provide constitutionally sufficient protection.  In 2021 alone, at least sixteen men died at Rikers Island.  The grim parade of avoidable deaths continued in 2022, when two more men died before decedent.  This is in addition to the numerous individuals who had died at Rikers in prior years due to the City's neglect.

110.    New York City Mayor Eric Adams has referred to Rikers as a "national embarrassment" and a "stain on our city" that must be closed for good.

111.    The CITY OF NEW YORK's deliberate indifference to the safety of inmates in at Rikers Island, and their rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, proximately caused the subject occurrence and decedent's injuries and death.

112.    By reason of the foregoing, defendant CITY OF NEW YORK, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the United States Constitution.

113.    By reason of the foregoing, decedent's Estate has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

114.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

**As and For a Sixth Cause of Action pursuant to 42 U.S.C. §1983 against defendant CITY OF NEW YORK**

115.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 114 as though set forth more fully herein.

116.    Defendant CITY OF NEW YORK, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the United States Constitution.

117.    As a result of the foregoing, decedent was caused to suffer wrongful death.

118.    By reason of the foregoing, plaintiff has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

119.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

## Conclusion

WHEREFORE, plaintiff demands judgment against defendant CITY OF NEW YORK in the sum of TWENTY MILLION DOLLARS ($20,000,000); against defendant NEW YORK CITY HEALTH AND HOSPITALS CORPORATION in the sum of TWENTY MILLION DOLLARS ($20,000,000); against defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5 in the sum of TWENTY MILLION DOLLARS ($20,000,000); punitive damages against the individual defendants herein; attorney's fees, pursuant to 42 U.S.C. §1988; the costs and disbursements herein; and such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
       August 5, 2022

                Yours, etc.,

                KELNER & KELNER, ESQS.
                *Attorneys for Plaintiff Sonia Talavera,*
                *as Administrator of the Estate of Herman Tito Diaz*

                By:_____
                   Joshua D. Kelner (JK-3303)
                7 World Trade Center, Suite 2700
                New York, New York 10007
                (212) 425-0700

                     – and –

                Neil D. Wollerstein (NW-8668)
                THE LAW OFFICE OF NEIL WOLLERSTEIN
                895 Sheridan Avenue
                Bronx, New York 10451